UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 05-231 (RJL) |
| | : | |
| v. | : | |
| | : | |
| FREDDIE TILLERY, | : | Sentencing Date: February 21, 2006 |
| Defendant. | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this Memorandum in Aid of Sentencing in the above-referenced case.

**I. Background**

In late April or early May of 2005, agents with the Federal Bureau of Investigation ("FBI") Safe Streets Task Force obtained information that the defendant, Freddie Tillery, had made statements that he planned to assist in the freeing of certain defendants (known as "the long-gun robbers") who were in custody and on trial in the United States District Court for the District of Columbia. Specifically, the defendant told an individual, who was a cooperating witness ("CW-1") working with law enforcement, that, while armed, he planned to take over the courthouse, and that upon entry into the courthouse he planned to shoot the court officer(s) at the entrance. The defendant said he would be assisted by friends and close associates of the long-gun robbers (who were on trial for a series of armed robberies before Judge Kollar-Kotelly). The defendant further told CW-1 that the friends and associates of the long-gun robbers had diagrams of the courthouse; that they knew the schedules of the court security officers; and that he planned to assist the long-gun robbers in escaping before the completion of their trial.

The FBI attempted to investigate the validity of this information, and learned that the defendant sold cocaine base in the area of XXXXXX in Northwest Washington, D.C. FBI agents then decided to focus on arresting the defendant for drug trafficking – to prevent the defendant from causing any potential attack upon the courthouse and to see if they could gain the defendant's cooperation in learning about the other potential suspects and the full scope of the escape plan.

Another confidential witness ("CW-2") working for the FBI's Safe Streets Task Force informed the agents about the details of the defendant's drug trade. More specifically, CW-2 stated that the defendant sold small quantities of cocaine base in the area of XXXXXX, N.W. The FBI agents then set up surveillance on the defendant, and decided to see if the defendant would sell cocaine base to CW-2.

On May 16, 2005, CW-2 purchased two ziplock bags of cocaine base from the defendant. Shortly after 8:00 p.m. on that day, CW-2 contacted the defendant by calling him on his cellular telephone. The defendant agreed to sell a quantity of cocaine base to CW-2 in the area of XXXXXX, N.W. Thereafter, CW-2 drove into the XXXXXX, N.W., and met the defendant. At that time, the defendant gave CW-2 two ziplock bags containing .55 grams of cocaine base in exchange for $40.00. This transaction was videotaped by FBI agents.

On May 17, 2005, CW-2 purchased an additional three ziplocks of cocaine base from the defendant. Shortly after 5:00 p.m. on that date, CW-2 contacted the defendant by calling him on his cellular telephone. At approximately 7:00 p.m., the defendant called CW-2 back and told CW-2 to meet him at 8th and Longfellow Streets, N.W. CW-2 drove to XXXXXX, N.W., and met the defendant. At that time, the defendant gave CW-2 three ziplock bags containing .91 grams of cocaine base in exchange for $60.00. This drug transaction was also videotaped by FBI agents. The

defendant exited CW-2's car and was immediately arrested. A search incident to arrest of the defendant revealed that the defendant had the pre-recorded $60.00, and the cellular telephone he used to call CW-2.

Subsequent to the defendant's arrest, FBI agents interviewed between eight and twelve witnesses who had information regarding the potential courthouse attack. One of the witnesses said that the lead defendant in the long-gun robbers case communicated with that witness about the potential escape. After the defendant's arrest, he refused to speak to law enforcement officers about the planned courthouse escape. After the FBI completed the investigation into the courthouse attack and escape plan, it was believed that the allegations were substantiated; however, the United States Attorney's Office for the District of Columbia determined that the allegations would not be presented to a grand jury.

The defendant was charged in a two-count indictment with two counts of Unlawful Distribution of Cocaine Base. On October 11, 2005, the defendant pled guilty to one count of Unlawful Distribution of Cocaine Base. Thereafter, the Court maintained the defendant's placement in a halfway house with the following conditions: that the defendant may leave the halfway house from 8:00 a.m. to 9:00 p.m. on Saturdays and Sundays; that he obtain employment; that he may receive social passes on the weekends to visit family; and that he undergo drug testing and counseling.

## II. Sentencing Considerations

A. <u>Statutory Maximum</u>

As stated, the defendant pled guilty to one count of Unlawful Distribution of Cocaine Base, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C). The maximum penalites for Unlawful Distribution of Cocaine Base are twenty years of incarceration, a fine of $1,000,000, a term of supervised release of three years, and a special assessment fee of $100.00.

B. <u>Sentencing Guideline Calculation</u>

Both parties agreed to the Guidelines calculations utilized in the Presentence Report ("PSR") which correctly calculated the defendant's total offense level at 29. <u>See</u> PSR ¶ 25. The PSR also correctly calculated the defendant's criminal history score as Category VI. <u>See</u> PSR ¶ 30. Therefore, as anticipated by both parties per the plea agreement, the Guidelines range for the defendant is correctly calculated in the PSR as 151 to 188 months of imprisonment. <u>See</u> PSR ¶ 59. The PSR writer did not find factors indicating that a downward departure is warranted. <u>See</u> PSR ¶ 75. For the reasons set forth below, the government respectfully recommends that the Court sentence the defendant at the bottom of the Guidelines range calculated in the PSR, that is, to 151 months of incarceration.

C. <u>The Impact of *Booker*</u>

It is the government's position that the Court should impose a sentence within the 151 to 188 month Guidelines range. In <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, 18 U.S.C. Section 3553(b)(1). <u>Booker</u>, 125 S. Ct. at 756-57. However, the Court expressly refused to

invalidate the Guidelines in their entirety. Id. at 764. To the contrary, the Court upheld the remainder of the Guidelines as the most appropriate benchmark for informing courts as to the most reasonable sentence for a particular defendant who has committed a particular crime. Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the range as set forth in the Guidelines, the court must state in a written order of judgment and commitment the specific reason for the imposition of a sentence different from that described in the Guidelines. See 18 U.S.C. Section 3554(c)(2). The sentence will then be subject to review by the court of appeals for "reasonableness." Booker, 125 S. Ct. at 766.

In Booker's wake, this Court must continue to resolve disputed questions of fact and law and correctly calculate a defendant's sentence under the existing Sentencing Guidelines. See Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing). "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Booker at 767 (citing 18 U.S.C. Sections 3553(a)(4), (5) (Supp. 2004)). In light of this mandate – and the continued requirement of written explanations for sentences that fall outside of the range called for by the Guidelines and the new standard of "reasonableness" review – it is plain that a sentence within the Guidelines, while not required, is reasonable per se. Not only is a sentence within the Guidelines range reasonable per se, but it also accommodates the goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences. Id.

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines,

consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing. Such characteristics, which are articulated in 18 U.S.C. Section 3553(a), include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; [and] . . . (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . .

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guidelines range as determined by this Court. Each Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history. See, e.g., Booker, 125 S. Ct. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); Id. at 759 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); Id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); Id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity."). Since the Guidelines currently represent the only extant

benchmark to encourage uniformity and thus the only tool to implement Congress' vision of sentencing uniformity and fairness, Guidelines range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

Booker, to be sure, departs from the prior practice of automatic reversal that would have accompanied the failure to sentence a defendant within the Guidelines. Such a sentence will now be reviewed instead for its "reasonableness." See id. at 764. Nevertheless, the Guidelines -- resulting as they do from years of study of sentencing practices, crime statistics, national crime policy, and consideration of the factors that inform sentencing, see 18 U.S.C. Section 3553(a) -- provide the most concrete yardstick against which to measure what would be unreasonable. Booker not only prevents courts from substituting their individual judgment about the appropriateness of the Guidelines range without explaining with specificity their reasoning, but Booker also continues to subject the explanation of the decision to sentence outside of the correctly calculated range to a court of appeals for reasonableness review. See 18 U.S.C. Section 3553(c) (mandating consideration of the Guidelines); 18 U.S.C. Section 3553(c)(2) (mandating written explanations for imposing a sentence outside of the applicable Guideline range); 18 U.S.C. Section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result of an incorrect application of the Guidelines); 18 U.S.C. Section 3742(f)(2) (mandating court of appeals to set aside a sentence outside the Guidelines range when the district court fails to provide a required statement of reasons in the judgment and commitment order).

In this case, as explained further below, no unusual circumstances exist that warrant an exception to the preference for Guidelines sentencing. Therefore, the government respectfully

recommends that the Court sentence the defendant within the Guidelines range calculated in the PSR.

### III.  Sentencing Recommendation

In determining the appropriate sentence, the Court "shall consider . . . the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. Section 3553(a)(2)(A).  In this case, the defendant was arrested after selling cocaine base to a confidential witness working with the FBI. The defendant made two drug transactions with CW-2, and agreed to continue to sell quantities of cocaine base to CW-2, but was arrested before any further drug sales occurred.  The conviction in the instant case represents the defendant's third drug distribution conviction, classifying him as a career offender under the Guidelines.  At least one of the defendant's previous drug convictions resulted from the sale of cocaine base in the same area as where he was arrested in this case. Furthermore, in both of the defendant's previous cases he was granted probation but his probation was revoked as a result of his having violated his conditions of release.  It is vital that the Court send a message to both the defendant and the community that the repeated distribution of controlled substances in the community will not be tolerated.  Moreover, the defendant committed the instant crime only nineteen months after unsuccessfully completing a previous drug trafficking sentence.

The defense maintains that due to the small quantity of drugs sold, the Court should depart from the Sentencing Guidelines and give the defendant a term of supervised release, with no further incarceration. The defense further contends that the defendant's sales would not have occurred but for the police action; that the police "set Mr. Tillery up"; and that the police "induced him to sell" the cocaine base. Def. Sent. Memo at 2, 5.  These contentions are without merit.

First, the defendant has previously sold cocaine base in that neighborhood, as evidenced by his 1995 drug conviction. Second, CW-2 provided details that the defendant was selling cocaine base in the area of XXXXXX, N.W. Third, when CW-2 approached the defendant, the defendant was ready, willing, and able to sell cocaine base to CW-2. Lastly, the defendant made two drug transactions, the second of which was in a larger quantity, and told CW-2 that he was available for further drug sales. For the defense to characterize the defendant as an innocent individual forced to participate in the drug transactions is disingenuous. Indeed, the defendant acknowledged his unlawful conduct, both by signing the factual proffer attached to the October 11, 2005 plea agreement and again under oath during the plea colloquy.

Also, the defendant claims that the small quantity of narcotics involved warrants a sentence of supervised release. Congress decided that the crime of distributing a detectable quantity of cocaine base is a serious crime. The maximum punishment is twenty years of imprisonment. The defendant has, on two prior occasions, committed the same crime. Congress has determined that an individual who commits a third drug trafficking charge is a career offender, and should be punished accordingly.

Given the seriousness of the defendant's actions, his prior criminal history, and the potential dangerous impact on the community, the government would ordinarily recommend a sentence at the high end of the Guidelines range. However, given the defendant's acceptance of responsibility, his recognition that he needs drug treatment, and his willingness to participate in drug treatment, the government recommends that the Court sentence the defendant to a period of incarceration at the low end of the Guidelines range.

It is a bedrock principle in our criminal justice system that each person is responsible for his actions and, as a result, accountable for them. The defendant is no exception. His scheme to repeatedly sell drugs was animated by a troubling, and all too common, motivation -- greed. The defendant sought personal gain without regard for the potential harm to the community.

The defendant requests this Court to disregard his criminal history and to sentence him to supervised release. In the written plea agreement dated October 11, 2005, and signed by the defendant, he acknowledged that he understood that he would be sentenced pursuant to consideration of the United States Sentencing Guidelines Manual. See Paragraph 1 of October 11, 2005 Plea Agreement. The PSR writer concluded, and the government agrees, that there is no information that would suggest a basis for a departure from the prescribed Guidelines range. The defendant has received a substantial benefit from this guilty plea and all the leniency the defendant should receive has been contemplated by the Guidelines and plea agreement. The defendant received a three-point decrease in his offense level because he accepted responsibility. (The government has filed a motion requesting that the Court grant the additional one-point decrease.) Further, the government is requesting sentencing at the bottom end of the Guidelines range for the defendant. Accordingly, the government believes that a term of incarceration at the low end of the prescribed Guidelines range is appropriate and will grant both the government and the defendant the benefit of the bargain negotiated.

## IV. Conclusion

Wherefore, the government respectfully requests that the Court sentence the defendant to 151

months of imprisonment.

        Respectfully submitted,

        Kenneth L. Wainstein
        United States Attorney
        D.C. Bar No. 451058

        _____

By:   Anthony Scarpelli
        Assistant United States Attorney
        D.C. Bar No. 474711
        Organized Crime and Narcotics Section
        555 Fourth Street, N.W., Room 4816
        Washington, D.C. 20530

### CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a copy of the foregoing pleading is to be served upon counsel for the defendant, Stephen Brennwald, Esquire, this 15th day of February, 2006.

        _____

        Anthony Scarpelli
        Assistant United States Attorney